IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | NO. 3:22-cr-00393 |
| v. | ) | |
| | ) | JUDGE RICHARDSON |
| | ) | |
| MILDER ESCOBAR-TEMAL | ) | |

# **MEMORANDUM OPINION**

Pending before the Court is Defendant's motion to dismiss the Indictment (Doc. No. 19, "Motion"). The Government filed a response (Doc. No. 24, "Response").

For the reasons discussed herein, the Court will deny Defendant's Motion.

## BACKGROUND

The Government filed a one-count indictment against Defendant alleging:

On or about October 12, 2022, in the Middle District of Tennessee, MILDER ESCOBAR-TEMAL, knowing he was an alien illegally and unlawfully in the United States, knowingly possessed a firearm, to wit: a Glock Model 23, .40 caliber pistol, a Taurus Model PT 809 9x19mm pistol, and a Hi-Point Model C9 9x19mm pistol; and the firearm was in and affecting commerce. In violation of Title 18, United States Code, Sections 922(g)(5) and 924.

(Doc. No. 1). 18 U.S.C. § 922 provides, in relevant part:

(g) It shall be unlawful for any person
    (5) who, being an alien
        (A) is illegally or unlawfully in the United States;

to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(g)(5)(A).

Defendant filed the Motion pursuant to Fed. R. Crim. P. 12(b)(3)(B). According to Defendant, dismissal is appropriate because 18 U.S.C. § 922(g)(5) is unconstitutional. He argues that: (a) the Second Amendment protects the right of unlawfully present aliens such as Defendant to keep and bear arms and (b) "[t]he government cannot show a historical tradition of prohibiting the possession of firearms based on immigration status." (Doc. No. 19 at 4-5). In its Response, the Government unsurprisingly disagrees.

## LEGAL STANDARD

A defendant can move to dismiss an indictment for failing to state an offense. Fed. R. Crim. P. 12(b)(3)(B). At this stage, "the indictment must be tested by its sufficiency to charge an offense" *United States v. Sampson*, 371 U.S. 75, 79 (1962), and "the allegations of the indictment must be taken as true," *Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 343 n.16 (1952).

## DISCUSSION

The Supreme Court announced, in *New York State Rifle & Pistol Ass'n Inc. v. Bruen*, 142 S. Ct. 2111 (2022), a change in how courts must approach Second Amendment challenges to government action. Under the now-required analysis:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Bruen*, 142 S. Ct. at 2129-30.

As indicated above, Defendant argues that (1) the Second Amendment's plain text extends to unlawfully present aliens because (according to Defendant) they are included within the Second Amendment's term, "the people" and (2) the Government cannot establish that there is a history and tradition of prohibiting firearm possession based on immigration status. (Doc. No. 19 at 4-5).

In order for Defendant to succeed on his Motion, Defendant must succeed on both of his arguments. The Court addresses the two arguments in turn.

A. <u>Plain text</u>

As an initial matter, the Court notes that constitutional rights are not necessarily limited to citizens and can apply to non-citizens, and more specifically to aliens unlawfully present in the country. *See, e.g., Yoc-Us v. Att'y Gen. United States*, 932 F.3d 98, 101, 104 (3d Cir. 2019) (holding that the Fourth Amendment applies to unlawfully present aliens (citing *Wong Wing v. United States*, 163 U.S. 228, 238 (1896) (holding that the Fourteenth, Fifth and Sixth Amendments apply to aliens)). And the Government does not argue otherwise. The issue here is whether the *Second Amendment in particular* applies to non-citizens, including aliens unlawfully in the country.

Asserting that this question should be answered in the affirmative, Defendant first argues that his conduct of possessing a firearm as an unlawfully present alien is protected by the Second Amendment's plain text. The Government argues that Defendant's conduct is outside the scope of the Second Amendment because its reference to "the people" refers only to citizens of the United States. (Doc. No. 24 at 5-6).

The Second Amendment states, "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. It is undisputed that Defendant's alleged possession of a firearm constitutes "keep[ing] and bear[ing] Arms" under the Second Amendment. Thus, the only disputed question bearing on whether the Second Amendment, by its terms, covers Defendant's conduct is whether Defendant, as an alleged unlawfully present resident of the United States, is a member of "the people."

The phrase "the people" appears five times in the Bill of Rights, namely in the First, Second, Fourth, Ninth, and Tenth Amendments. U.S. Const. amends. I, II, IV, IX, X. Noting that

the meaning of "the people" is consistent throughout these five amendments, the Supreme Court has twice defined "the people" in recent cases:

> While this textual exegesis is by no means conclusive, it suggests that 'the people' protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community.

*United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990).

In *D.C. v. Heller*, 554 U.S. 570, 580 (2008), the Court approvingly quoted *Verdugo-Urquidez*'s "national community" definition while also stating, "in . . . provisions of the Constitution that mention 'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset." The *Heller* court was neither amending *Verdugo-Urquidez*'s definition nor attempting to resurrect *Dred Scott v. Sandford*, 60 U.S. 393, 404, 15 L. Ed. 691 (1857), *superseded* (1868) ("The words 'people of the United States' and 'citizens' are synonymous terms, and mean the same thing."). Thus, contrary to the Government's argument, "political community" should not be understood as consisting only of citizens. Rather, it refers to members of the "national community" who have such a connection with the United States that they have a significant vested interest in the political processes of the nation and are represented in politics (regardless of the ability to vote). This surely can include people who are noncitizens.[1]

---

[1] The Court finds inapposite the Government's assertions (Doc. No. 24 at 6) that the English Bill of Rights 1689 expressly limited the right to keep and bear arms to "subjects which are Protestants" and did not extend to aliens. 1 W. & M. c.2. "Subjects" within the meaning of the English Bill of Rights 1689 is by no means necessarily the same as "people" as used in the Second Amendment, especially considering that the notion of "subjects" in England in 1689 had connotations (regarding, apparently, being "subject" to the jurisdiction or rule of the English monarch) that would be patently inapplicable to governing documents for the United States (formed as it was to break away from that monarchy). Therefore, the asserted fact that eighteenth-century England statutorily restricted gun ownership to landed gentry, which would exclude aliens under English common-law, is also unilluminating. *See Bruen*, 143 S. Ct. at 2136 ("As with historical evidence generally, courts must be careful when assessing evidence concerning English common-law

This is further confirmed by the text of the Constitution itself, which uses the term "Citizen of the United States" elsewhere, thus suggesting the Second Amendment does not protect only "Citizen[s] of the United States" because otherwise that term (rather than "the people") would have been used in the Second Amendment. *See e.g.* U.S. Const. art. 1, § 2, § 3; *Id.* at art. 2, § 1.

Furthermore, "the people" may, in certain circumstances, encompass unlawfully present aliens. Though the Court did not squarely decide whether the Fourth Amendment protects "illegal aliens," *Verdugo-Urquidez*, 494 U.S. at 272, its definition of "the people" suggests that anyone who "develop[s] sufficient connection with this country to be considered part of that [national] community" is included in "the people." An alien resident, lawfully or unlawfully in the United States, could develop such connections such that they are part of the national community. Being unlawfully present in the United States does not necessarily create an insurmountable barrier to developing community connections and thus becoming being part of "the people."

That said, because the Court can resolve Defendant's motion based on whether history and tradition supports the challenged regulation, the Court will not come to a definitive conclusion regarding whether Defendant is a member of "the people" and will assume arguendo that he is. *See United States v. Perez*, 6 F.4th 448 (2d Cir. 2021) (assuming arguendo that the Second Amendment protects unlawfully present aliens); *United States v. Torres*, 911 F.3d 1253 (9th Cir. 2019) (same); *United States v. Jimenez-Shilon*, 34 F.4th 1042 (11th Cir. 2022) (same).

B. <u>Historical tradition</u>

"When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy—a commonplace task for any lawyer or

---

rights. The common law, of course, developed over time. And English common-law practices and understandings at any given time in history cannot be indiscriminately attributed to the Framers of our own Constitution.") (citations omitted).

judge. Like all analogical reasoning, determining whether a historical regulation is a proper analog for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'" *Bruen*, 142 S. Ct. at 2132 (quoting C. Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 741, 773 (1993)).

The undersigned has repeatedly noted that the notion of "similarity" is a subjective and relative one, and that, relatedly, an ill-defined continuum runs between "similar" and "different." *E.g., Doe #11 v. Lee*, 609 F. Supp. 3d 578, 606 n.31 (M.D. Tenn. 2022). The best the Court can do is call it like it sees it when it comes to "relative similarity," following whatever guidance he can glean from *Bruen* on this topic.

Though the *Bruen* Court did not "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment," courts may evaluate similarity by comparing "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S. Ct. at 2133. "On the one hand, courts should not 'uphold every modern law that remotely resembles a historical analog[ ],' because doing so 'risk[s] endorsing outliers that our ancestors would never have accepted.' On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical analog[ ], not a historical twin. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* (quoting *Drummond v. Robinson*, 9 F.4th 217, 226 (3rd Cir. 2021)).

The Government argues that several types of Founding-era laws are analogous to § 922(g)(5). It argues that "laws barring Native Americans, Catholics, and Loyalists from bearing arms" as well as laws disarming "those who refused to 'swear[] fidelity to the revolutionary regime,' 'who defamed resolutions of the Continent Congress,' or 'who were unwilling to abide

by . . . legal norms'" are relevantly similar to § 922(g)(5). (Doc. No. 24 at 9) (quoting *Range v. Att'y Gen.*, 53 F.4th 262, 278-79 (3d Cir. 2022) *vacated on other grounds. Range v. Att'y Gen. United States of Am.*, 56 F.4th 992 (3d Cir. 2023).

    1. *Laws barring Native American, Catholic, and loyalist gun ownership*

In the colonial era, Massachusetts and Virginia enacted bans on gun ownership[2] by Native Americans. *United States v. Perez*, 6 F.4th 448, 462 (2d Cir. 2021) (Menashi, J., concurring) (citing Joyce Lee Malcolm, To Keep and Bear Arms: The Origins of an Anglo-American Right 140 (1996)). But such bans are not, under *Bruen*, analogous to bans on ownership by unlawfully present aliens. The colonial bans were race-based. Though they may have been partially motivated by the fact that Native Americans were not typically allowed to participate in the militia,[3] it is notable that these laws did not broadly prohibit firearm ownership by immigrants generally; instead, they targeted a specific race. Furthermore, though such laws existed near the time of the Founding, they indisputably would be unconstitutional today under the Equal Protection Clause. Any law that, like bans on Native American gun ownership, targeted members of a specific race would be similarly constitutionally suspect. *See also United States v. Leveille*, No. 1:18-CR-02945-WJ, -F.Supp.3d-, 2023 WL 2386266, at *3 n.3 (D.N.M. Mar. 7, 2023) ("The Court does not find the prior history of disarmament of Native Americans meaningfully comparable to present-day disarmament of unlawfully present aliens. Native Americans were, of course, already present on the North American Continent before any Europeans arrived, and there was an element of direct conflict between colonists and Native Americans that is not present in present-day interactions

---

[2] For the purposes of analysis under *Bruen*, the Court has little trouble concluding that bans on gun *ownership* are analogous to the ban on gun *possession* set forth in § 922(g)(5).

[3] Malcolm, *supra*, at 141.

between the United States Government and unlawfully present aliens in the United States illegally.").

The Government references a 1756 Virginia statute, titled "An Act for disarming Papists, and reputed Papists, refusing to take the oaths to the government," which barred Catholics from owning arms unless they swore an oath of allegiance to the Crown. 7 William Waller Hening, The Statutes at Large; a Collection of all the Laws of Virginia 35 (1820). It reads: "no Papist, or reputed Papist so refusing [to take an oath of allegiance] . . . shall, or may have, or keep in his house or elsewhere . . . any arms, weapons, gunpowder or ammunition[.]" *Id.* The "Act for disarming Papists" is also inapt and constitutionally suspect (this time, under the Free Exercise Clause). The Virginia statute was, at least in part, rooted in the idea that those who bear arms hold "undivided allegiance to the sovereign." Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & Hist. Rev. 139, 157 (2007). Though the "why" underlying § 922(g)(5) may be similar to one of the "whys" underlying the Virginia statute (though there may have been other "whys" underlying the Virginia statute that would be constitutionally suspect today), the "how" of the two statutes are not sufficiently similar to make them analogous under *Bruen*. *See Range*, 53 F.4th at 277 ("In sum, Protestants in the colonies—as in England—disarmed Catholics not because they uniformly posed a threat of armed resistance, but rather because the Protestant majorities in those colonies viewed Catholics as defying sovereign authority and communal values."). Whatever the aims of colonial Virginia's statute, the basis for placing persons within the scope of its prohibition (belonging to a particular religion) is not analogous to the criteria for placing persons within the scope of the prohibition of § 922(g)(5), and if they were, § 922(g)(5) would be unconstitutional on grounds other than the Second Amendment. *See Range v. Att'y Gen. United States of Am.*, No. 21-2835, -

F.4th-, 2023 WL 3833404, at *6 (3d Cir. June 6, 2023) ("That Founding-era governments disarmed groups they distrusted like Loyalists, Native Americans, Quakers, Catholics, and Blacks does nothing to prove that Range is part of a similar group today. And any such analogy would be far too broad.");[4] *Range*, 53 F.4th at 276 n.18 ("The status-based regulations of this period are repugnant (not to mention unconstitutional), and we categorically reject the notion that distinctions based on race, class, and religion correlate with disrespect for the law or dangerousness.").

Finally, Revolution-era laws barring loyalists from possessing guns are not analogous to § 922(g)(5). Loyalists were actively denying the legitimacy of, and often fighting (sometimes in organized units aligned with the British Army) against, the United States.[5] Armed loyalists therefore could (and did) pose an active threat to the fledgling United States during the Revolution. This is not generally the case with unlawfully present aliens, a group characterized by its members' wish to be present in the United States (illegally), not a wish to subvert the existence of the United States.

---

[4] Regarding the pre-Founding laws barring Native American and "Papist" arms ownership, it is important to note that these colonial laws were passed in light of the English Bill of Rights 1689, which states "[t]hat the subjects which are Protestants may have arms for their defence [sic] suitable to their conditions and as allowed by law[.]" 1 W. & M. c.2. The right to keep and bear arms enumerated at the Founding in the United States is quite different in several relevant respects. For example, the Second Amendment is not expressly limited to protecting Protestants. Thus, in analogizing current laws to colonial laws passed when non-Protestants did not have an enumerated right to have arms, the probative value of pre-Founding laws is lower when those colonial laws target non-Protestants for disarmament. Those colonial laws may not be helpful for describing the right to keep and bear arms because under the English Bill of Rights, that right was denied to non-Protestants.

[5] Notably, there was a United States effective July 1776, even though a national compact for the United States (first the Articles of Confederation and then, roughly a decade later, the Constitution) did not come until later.

### 2. *Disarming those who do not swear an oath of allegiance to the state*

The Government cites *Range*, which discusses a Pennsylvania law proscribing the bearing of arms by those who did not swear an oath of allegiance.

> Pennsylvania likewise disarmed non-violent individuals who were unwilling to abide by the newly sovereign state's legal norms. The legislature enacted a statute in 1777 requiring all white male inhabitants above the age of eighteen to swear to "be faithful and bear true allegiance to the commonwealth of Pennsylvania as a free and independent state," Act of June 13, 1777, § 1 (1777), 9 The Statutes at Large of Pennsylvania from 1652–1801 110, 111 (William Stanley Ray ed., 1903), and providing that those who failed to take the oath—without regard to dangerousness or propensity for physical violence—"shall be disarmed" by the local authorities, id. at 112–13, § 3.

*Range*, 53 F.4th at 278. Virginia passed a similar statute. *Id.*[6]

The laws requiring oaths are sufficiently analogous to § 922(g)(5) for two reasons. First, both the oath-requiring laws and § 922(g)(5) attempt, however ham-fistedly, to distinguish between those who are likely to comply with certain communal obligations and those who are less likely to do so. *See Range*, 53 F.4th at 278 ("Refusal of some, such as Quakers, to swear allegiance demonstrated that they would not submit to communal judgments embodied in law . . ."). Unlawful presence in the United States correlates with potential noncompliance with certain government registrations and identification, which may result in different levels of communal participation.

---

[6] Though the states were not subject to the federal Bill of Rights around the time of the Founding, *see Barron v. City of Baltimore*, 32 U.S. 243, 247-249 (1833), the Pennsylvania law may be properly compared to § 922(g)(5) because at the time, the Pennsylvania Constitution had a provision analogous to the Second Amendment. Pa. Declaration of Rights, § 13 ("That the people have a right to bear arms for the defence [sic] of themselves and the state."). By contrast, at the time Virginia passed its oath requirement to possess a firearm, Virginia did not explicitly provide for an individual right to keep and bear arms. *See* Va. Declaration of Rights, § 13. Virginia's Declaration of Rights did contain a provision similar to the preamble of the Second Amendment, stating "[t]hat a well-regulated militia, composed of the body of the people, trained to arms, is the proper, natural, and safe defense of a free state[.]" *Id.* But this statement does not necessarily entail the same individual right to keep and bear arms enumerated in the Second Amendment; it only implies that the people as a whole should be trained to arms. Because Virginia did not, at the time, have a precise analog to the federal right to keep and bear arms, the relevance of its Founding-era laws is diminished in analogical reasoning.

For example, unlawfully present aliens are not eligible to receive many federal social services, such as Social Security benefits.

Second, these laws attempt, however ham-fistedly, to distinguish between those who abide by the norms of a civic community and those who do not. *See Range*, 53 F.4th at 278 ("by disarming individuals whose refusal to take these oaths evinced not necessarily a propensity for violence, but rather a disrespect for the rule of law and the norms of the civic community."). Under current law, unlawful presence in the country is demarcated as a line of civic significance that symbolically defines the relationship between the state and individual,[7] just as oath-taking was during the Founding-era. Thus, the how and why of oath-requiring laws are analogous to § 922(g)(5), establishing a history and tradition that supports the challenged law. *See Leveille*, 2023 WL 2386266, at *4 ("By analogy, the Court does find that the historical restrictions on individuals who did not swear an oath of allegiance or otherwise might be considered national outsiders is sufficiently similar to § 922(g)(5) to support the law as it exists today. Today's immigration system functions as an attempt to define the nation's members and nonmembers.").

Defendant argues that such laws are not analogous "because the law generally forbids such immigrants—absent proof of a special basis for gaining immigration status—from taking the oath of allegiance to the United States that is part and parcel of becoming a U.S. citizen." (Doc. No. 19 at 6). But the question is not whether an unlawfully present alien may be made to take an oath, but rather whether Founding-era laws requiring oaths to keep and bear arms are analogous to § 922(g)(5) in their objectives and means of achieving those objectives.

---

[7] As Defendant points out, there were no immigrants at the Founding-era that were considered "unlawfully in the United States." (Doc. No. 5 at 8). But just as oath-taking was considered a significant civic demarcation in the Founding-era and no longer is, immigration status has become a civic demarcation when it was not at the Founding. What is significant is not what specifically is used as a demarcation, but that civic demarcations generally were used in regulating arms ownership.

Defendant also argues that "the central concern of the Second Amendment is the ability to defend oneself using arms, *Bruen*, 142 S. Ct. 2133, and unlawfully present aliens have that need as much, or more, than anyone in this country since they are often deterred from turning to police for protection due to fears of deportation." *Id.* at 7. Defendant misses the point here. The Court has assumed arguendo that Defendant's possession of firearms is protected by the Second Amendment, whatever the "concern" of the Second Amendment and whatever the need for unlawfully present aliens to have firearms. The question here is the extent to which historical analogs are sufficiently similar to § 922(g)(5) such that § 922(g)(5) is compatible with the Second Amendment (so that Defendant's assumed rights under the Second Amendment properly can be curtailed by § 922(g)(5) even if Defendant is covered by the Second Amendment). The historical analog at issue here, *i.e.,* the laws requiring loyalty oaths, did not seemingly balance a need for self-protection against the need for national allegiance. After all, those who did not swear oaths also may have had a greater than average need for self-protection; for example, loyalists may have had a glaring need for protection against pro-independence revolutionaries. And the Supreme Court held in *Bruen* that Courts are not to reevaluate the balance that was struck at the Founding. *Bruen*, 142 S. Ct. at 2129-30.

Thus, § 922(g)(5) is "relevantly similar" to Founding-era laws requiring oaths of allegiance to keep and bear arms. Therefore, it survives *Bruen*'s test for constitutionality.

CONCLUSION

For the reasons discussed herein, the Court will deny Defendant's motion to dismiss the Indictment (Doc. No. 19). An appropriate accompanying order will be entered.

*Eli Richardson*
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE